

**NUMBER 13-07-101-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

**ERASMO FRAIRE SALAZAR,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

**On appeal from the 338th District Court of Harris County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Justice Yañez**

After a jury trial, appellant, Erasmo Fraire Salazar, was convicted of the offense of murder, and his punishment was assessed by the jury at thirty years' imprisonment. On appeal, Salazar's counsel filed a brief arguing that the evidence is factually insufficient to support appellant's conviction, while Salazar filed a pro se brief arguing that he was denied the effective assistance of counsel at trial. We affirm.

## I. FACTUAL SUFFICIENCY

## A. Applicable Law

When reviewing the factual sufficiency of the evidence, we begin with the presumption that the evidence supporting the verdict is legally sufficient.[1] We view all of the evidence in a neutral light.[2] We may set the verdict aside if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust; or (2) the verdict is against the great weight and preponderance of the evidence.[3] While we may disagree with the jury's conclusions, we must exercise appropriate deference to avoid substituting our judgment for that of the jury, particularly in matters of credibility.[4] Thus, while we are permitted to substitute our judgment for that of the jury when considering credibility and weight determinations, we may do so only to a very limited degree.[5]

A person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.[6] Intent can be inferred from the acts, words, and conduct of the defendant.[7]

---

[1] *See Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 2006).

[2] *See id.; Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997).

[3] *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (citing *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)).

[4] *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); *see also Watson*, 204 S.W.3d at 414 (stating that an appellate court should not reverse a verdict it disagrees with unless it represents a manifest injustice, though supported by legally sufficient evidence).

[5] *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

[6] TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (Vernon 2003).

[7] *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

## B. Trial Testimony

On appeal, Salazar argues that there is factually insufficient evidence that he *intentionally or knowingly* caused the death or serious bodily injury of the victim, Roberto Mosqueda ("Roberto"). Accordingly, we shall only discuss the trial evidence that is relevant to the issue of intent.

### 1. Magdalena Garcia Martinez's Testimony

Magdalena Garcia Martinez ("Magdalena") was married to Roberto when he died on May 7, 1984. When Magdalena first testified on December 5, 2006—more than twenty-two years after Roberto's death—her memory of what happened the night Roberto was killed was not entirely clear. Prior to testifying, Magdalena reviewed a statement she had given police shortly after Roberto was killed. Though Magdalena could recall talking with police after Roberto's death, she could not recall giving them a statement.

According to Magdalena, she and Roberto were in their apartment at 2:30 in the morning on May 7, 1984. Around that time, she heard a persistent, loud knocking on her door. She opened the door and saw Salazar and his girlfriend, Rosie. Magdalena and Roberto were friends with Salazar and Rosie; they had known each other for approximately fifteen months. Salazar entered the apartment and began yelling at Roberto. Salazar was upset and his yelling related to the subject of Rosie's alleged infidelity. Magdalena testified that Roberto had previously told Salazar that Rosie was cheating on him. Magdalena remembered Roberto being asleep prior to Salazar's knocking, but she could not recall whether Roberto awoke to Salazar's presence or whether Salazar attempted to awake Roberto. She did recall Salazar shooting Roberto once with a gun, and Roberto falling to

3

the floor after being shot. Magdalena could not recall trying to get between Salazar and Roberto before the shot was fired, but she did recall suffering gun powder burns on her arm. Under questioning, Magdalena stated that she could not recall whether Salazar was trying to shoot Roberto. She did testify, however, that (1) Salazar pointed the gun at Roberto, (2) Roberto did not have a weapon and did not attempt to grab the gun from Salazar, (3) Salazar shot Roberto, and (4) Salazar and Rosie then left the apartment.

On the second day of Salazar's trial, Magdalena again testified. Under direct-examination by Salazar's counsel, Magdalena testified that Roberto sometimes carried a pocketknife. She also testified about what transpired shortly before Roberto's death. According to Magdalena, Roberto went to a club with Salazar the evening before he was killed. Roberto became intoxicated, and eventually returned to the apartment at 1:00 in the morning, at which point he went to sleep. When Salazar knocked on the apartment door later that night, Magdalena opened the door for him and turned on the lights inside the apartment.[8] Salazar began asking Roberto if Rosie was going out with another man. Magdalena testified that Roberto responded to Salazar's questions, answering that he had seen her with another man. Magdalena further stated that Roberto never attacked Salazar or Rosie, and never attempted to grab the gun from Salazar.

Under cross-examination by the State, Magdalena stated that she had not had an opportunity to read a Spanish translation of her statement to police prior to her first day of testimony, which had since been provided to her. Magdalena testified that (1) Roberto was

---

[8] Magdalena stated that she could not remember whether she had previously told anyone that someone else had opened the door for Salazar. Magdalena later stated, however, that she had never told anyone that Roberto opened the door for Salazar.

asleep when Salazar entered the apartment; (2) Salazar had been drinking and was upset that night; (3) Salazar asked Roberto questions about Rosie; (4) Salazar kicked Roberto in an attempt to awake him; (5) when Salazar aimed the gun at Roberto, Magdalena jumped between them and asked Salazar to return the next day when he was calm; (6) Salazar kicked Magdalena in the stomach to get her out of the way; and (7) Salazar then shot Roberto in the stomach and left the apartment with Rosie.

## 2. Roger Milton's Testimony

Roger Milton, an assistant medical examiner at the Harris County Medical Examiner's Office, discussed Roberto's autopsy report. Milton stated that Roberto was one to three feet from the gun when he was shot. He testified that Roberto's wound was not a defensive wound (i.e., the type of wound someone receives when taking a defensive posture). The autopsy report did not state that Roberto had any contusions, lacerations, or injuries of any kind to his knuckles or hands. The report did reveal that Roberto's blood alcohol level was .278. According to Milton, after reviewing pictures of Magdalena's arms, which were taken shortly after Roberto's death, he was of the opinion that she was closer to the gun than Roberto was at the time it was fired.

## 3. Salazar's Testimony

Salazar testified that he went to a few bars with Roberto the evening before his death. Salazar stated that he drove Roberto to a bar called the Rio Bravo. After consuming alcohol together at the Rio Bravo, Roberto left the bar in Salazar's truck because he needed to move items for his apartment. Salazar remained at the Rio Bravo, waiting for Roberto to return. When Roberto returned to the bar two hours later, the men remained drinking at the bar. When Roberto returned to the Rio Bravo, he showed Salazar

5

a pistol. According to Salazar, he and the bartender instructed Roberto to take the pistol out of the bar, and Salazar told him to leave it in the truck. Roberto complied. While at the Rio Bravo, Roberto repeatedly told Salazar that Rosie was cheating on him. According to Salazar, he told Roberto that he wanted him to repeat his accusations in front of Rosie.

The two eventually drove to another bar called El Columpio, where they continued to drink alcohol. Salazar later dropped Roberto off at his apartment, and Salazar proceeded to meet Rosie at a bar. After leaving the bar together, Salazar told Rosie that he was going to Roberto's apartment so Roberto could repeat his accusations of infidelity against Rosie in front of her. On their way to the apartment, Rosie discovered Roberto's pistol. When they reached the apartment, Salazar took the pistol and placed it inside his pant waistline with the intent of giving it back to Roberto.

Salazar testified that he knocked on Roberto's door twice with normal force. Magdalena opened the door and invited him and Rosie inside. Salazar told Magdalena that he wanted to speak with Roberto, but she told him that he was sleeping. According to Salazar, it was dark in the apartment, preventing him from even seeing where Roberto was sleeping. Magdalena walked toward where Roberto was sleeping but could not awaken him. Salazar then walked toward Roberto and attempted to awake him, but he too was unsuccessful. Salazar testified that after tying to awake Roberto, who was sleeping in a very dark area of the apartment, Salazar returned to the entrance of the apartment. At that point, Rosie began telling Salazar that Roberto was a bad friend to him because he had been trying to have an affair with her. When she said this, Roberto began yelling at Rosie and threatening her. Salazar testified that though he could not see Roberto, he "felt that [Roberto] got up and he hit Rosie." He also testified that he heard something that

6

sounded like a "blade," causing him to worry that Roberto had a pocketknife. Salazar testified that after Roberto hit Rosie, Roberto then lunged at him. Salazar believed that Roberto was attempting to remove the pistol from his waistband. Salazar testifed that during his struggle with Roberto, the pistol accidentally fired, hitting Roberto. Salazar checked Roberto's condition, but he was non-responsive. He told Magdalena to call an ambulance, but no phone was available in the apartment. Salazar then fled the apartment with Rosie because he became scared.[9]

### 4. Additional Witness Testimony

Laura Romero testified that approximately three months prior to trial, she spoke with Magdalena about Roberto's death. According to Romero, Magdalena told her that Roberto had opened the door for Salazar on the night in question. Another witness, Armando A. Arredondo, testified that shortly after Roberto's death, he overheard his wife have a conversation with a woman named Nina. During this conversation, Nina told his wife that Roberto had died while struggling for control of a gun.

### C. Discussion

In light of Magdalena's testimony, we find the evidence establishing that Salazar intentionally or knowingly caused death or serious bodily injury to Roberto is not so weak that the verdict is clearly wrong and manifestly unjust.[10] Though Magdalena's testimony was sometimes contradictory, she steadfastly denied that Salazar had struggled with

---

[9] We note that Salazar was arrested shortly after Roberto was killed. Salazar was out on bond when he failed to appear at his first scheduled trial. Salazar fled to Wisconsin, where he eluded authorities for two decades. Salazar testified that he fled because he was afraid of the possibility of being found guilty and receiving a lengthy sentence.

[10] See Watson, 204 S.W.3d at 414-15.

7

Roberto for control of the gun, and asserted that Salazar pointed the gun at Roberto and shot him. The jury was free to believe Magdalena's testimony over Salazar's.[11] In addition to concluding that Magdalena was more credible than Salazar, the jury may have also concluded that Magdalena's version of how the shooting took place was better supported by the evidence (i.e., the testimony of the medical examiner, Robert Milton). Magdalena's contention that she positioned herself between Salazar and Roberto, and that Salazar then kicked her off to the side immediately prior to shooting Roberto, complements Milton's opinion that Magdalena was closer to the gun than Roberto was when it fired.

We further find that the evidence establishing that Salazar intentionally or knowingly caused death or serious bodily injury to Roberto is not against the great weight and preponderance of the evidence.[12] The jury was free to disbelieve the testimony of Salazar and other defense witnesses—witnesses that were not present when Roberto was killed.[13] We do not believe the jury's verdict represents a manifest injustice.[14] Accordingly, we find that the evidence is factually sufficient to support Salazar's murder conviction. Salazar's sufficiency challenge is overruled.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Although Salazar is not entitled to hybrid representation,[15] we will address the

---

[11] *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008) ("Because the jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony.").

[12] *See Watson*, 204 S.W.3d at 414-15.

[13] *See Lancon*, 253 S.W.3d at 707.

[14] *See Drichas*, 175 S.W.3d at 799.

[15] *See Patrick*, 906 S.W.2d at 498.

argument raised in his pro se brief in the interest of justice.  The sole issue raised in

Salazar's pro se brief is an ineffective assistance of counsel claim.  The court of criminal

appeals recently discussed the standard for reviewing this type of claim in *State v. Morales*,

stating:

> A claim of ineffective assistance of counsel entails two components. The appellant must establish both that his trial counsel performed deficiently and that the deficiency operated to prejudice him.  In evaluating the first component, reviewing courts must not second-guess legitimate strategic or tactical decisions made by trial counsel in the midst of trial, but instead "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"  This means that unless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate unless the challenged conduct was so outrageous that no competent attorney would have engaged in it.[16]

In his pro se brief, Salazar asserts that his trial counsel, Carlos Correa, "presented a 'false

witness' and manufactured evidence by procuring the services of Laura Romero to present

perjured testimony without [Salazar's] knowledge at the time of trial."

## A. Laura Romero's Testimony

Laura Romero's testimony at Salazar's trial was, to the say the least, bewildering.

While under direct examination by Correa, Romero testified that she lived in Cleveland,

Texas, and was employed by a company as a marketing sales director, which required her

to visit different places to promote various companies interested in opening businesses in

predominantly Hispanic-populated areas.  She stated that in September of 2006, she was

on a job assignment in Nebraska, where she was in a neighborhood surveying people

---

[16] *State v. Morales*, 253 S.W.3d 686, 696-97 (Tex. Crim. App. 2008) (footnotes and quotations omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

about their interest in Mary Kay Cosmetics. While in this neighborhood, Romero randomly came upon Magdalena's home. Romero asserts that she did not know anything about Magdalena at this time. Romero testified that she entered Magdalena's home to discuss Mary Kay Cosmetics, and that she remained in the home for awhile because there was a tornado in the area, and she wanted to remain in the home until the tornado passed. While in the home, Magdalena began discussing the death of her late husband, Roberto. According to Romero, Magdalena told her that Roberto was shot by a friend after he opened his apartment door for the friend. Romero testified that at some later date, a detective from Dallas, who she could not name, called her. The detective told her that she needed to appear as a witness at Salazar's trial in Houston. Romero testified that she arrived at Magdalena's home by chance, and that she did not know Salazar or his trial counsel at the time this occurred.

After her direct examination, the State cross-examined Romero, resulting in the following exchange:

Q:   You got a phone call out of the blue from a detective?

A:   Not, not at that moment. I received it after we were in that place.

Q:   How would somebody know that you had been to Magdalena Garcia Martinez's home?

A:   No idea, ma'am.

Q:   Did somebody ask you to go to that home?

A:   No, ma'am.

Q:   Ask you to go to that home and talk to the victim?

A:   No, ma'am.

10

Q:      So, you are saying it was just out of the blue you happened by this woman's home?

A:      Yes, ma'am.  Me and my partner, yes.

Q:      And there just happened to be a storm that day?

A:      Yes.

Q:      And you just happened to open up with her?

A:      Well, I received a phone call from Dallas that I have to be in court for some witness—that I have to be a witness.  And then that's why she say: Oh, I have to go to Houston, too.  That's why we start talking about that.

Q:      What I don't understand, though, is how it is possible that a door-to-door marketer would engage in a conversation like this with someone and then you would be contacted by a detective at a later date?

        . . . .

Q:      Does that make any sense to you?

A:      No.  I was even surprised, but what can I do?

On the next day of Salazar's trial, the State conducted a direct examination of Romero.  The State's questioning challenged whether Romero was employed by Mary Kay Cosmetics.  Romero stated that she did not work for the company, but asserted that she worked in correlation with the company.  Romero testified that she did telemarketing for different companies.  When pressed by the State to name the employer that sent her to Nebraska, Romero stated that her employer's name was "Telemarketing Company," located in Dallas, Texas.  Romero could not provide an address for her employer.  When asked how one would contact her employer, Romero asserted that employees cannot contact the company; rather, only the company can contact its employees.

**B. Discussion**

11

If Salazar's counsel did in fact instruct Romero to commit perjury, then Salazar has raised an ineffective assistance of counsel claim that warrants great consideration. An attorney undoubtedly performs deficiently by knowingly presenting perjured testimony—for permitting perjured testimony can never be a legitimate strategic or tactical decision. Whether or not an attorney's act of perjury is prejudicial, however, is a matter that must be assessed on a case-by-case basis. In the instant case, Salazar needed the jury to find him credible; it was his word against Magdalena's with regard to the manner in which Roberto died. Accordingly, the concern for Salazar is whether his credibility with the jury suffered as a result of Romero's testimony.[17]

We are precluded from entertaining this concern because Salazar has not presented this Court with any evidence to support the assertion that his trial counsel, Carlos Correa, committed perjury at trial. Even if this Court were to sua sponte take judicial notice of the fact that the Harris County District Attorney's Office charged Correa with aggravated perjury,[18] stemming from Romero's testimony at Salazar's trial,[19] Salazar would still be lacking the necessary evidence for his ineffective assistance of counsel claim. Salazar's counsel must be presumed innocent, until proven guilty. Accordingly, it would be imprudent to address Salazar's ineffective assistance claim when Salazar's

---

[17] We observe that a jury would likely judge a defendant's credibility not only through his own testimony, but also through the testimony he is perceived as proffering through witnesses speaking in his defense.

[18] *See* TEX. R. EVID. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Granados v. State*, 843 S.W.2d 736, 738 (Tex. App.–Corpus Christi 1992, no pet.) ("An appellate court may take judicial notice for the first time on appeal.").

[19] *See generally* Brian Rogers, *Attorney Arrested on Charges of Perjury*, THE HOUSTON CHRONICLE, Dec. 11, 2007, at B3 (discussing Correa's arrest after being charged with aggravated perjury for directing a family friend, Laura Romero, to testify falsely in a murder trial).

12

counsel has only been charged with perjury, rather than convicted of perjury. Because Salazar has not presented this Court with a record solidly evidencing the basis for his ineffective assistance claim, we overrule his issue on appeal.[20]

### IV. CONCLUSION

We affirm the trial court's judgment.

LINDA REYNA YAÑEZ,
Justice

Do not publish. TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and filed
this the 20th day of November, 2008.

---

[20] We note that we have not decided whether Salazar did or did not receive ineffective assistance of counsel as a result of the alleged perjury. Our decision to overrule Salazar's claim is based on the limited record before us. Salazar may still submit his ineffective assistance of counsel claim for review on the merits in an application for writ of habeas corpus. *See Rylander v. State*, 101 S.W.3d 107, 111 n.1 (Tex. Crim. App. 2003).